[No. 32184. *En Banc.* June 16, 1953.]

LACEY PLYWOOD COMPANY, INC., *Respondent,* v. H. C. WIENKER *et al., Appellants.*[1]

*Taylor & Revelle,* for appellants.

*Brodie, Brodie & Fristoe,* for respondent.

FINLEY, J.—This is an action to recover a down payment of four thousand dollars. It is based upon plaintiff's claimed rescission of a contract for the purchase of machinery adaptable for manufacturing plywood.

Lacey Plywood Co., Inc., a Washington corporation (hereinafter referred to as Plywood) agreed to purchase, and H. C. Wienker, d/b/a Wienker Machinery Company (hereinafter referred to as Wienker) agreed to sell a used Baldwin Southwark steam plate press. The press, located at Binghamton, New York, was to be used by Plywood in its plant at Lacey, Washington. Neither of the parties inspected the press prior to their agreement of sale. Wienker had exhibited a photograph of a used steam plate press to representatives of Plywood. There is some dispute as to whether there was an understanding that the photograph showed the identical press that was the subject of the agreement or

[1]Reported in 258 P. (2d) 477.

another press of similar make, model, and design. Subsequently, Wienker actually inspected the press at Binghamton, and had it shipped to Seattle.

Advised of its arrival, two representatives of Plywood went to Seattle to inspect the press. The steam plates and, apparently, other parts of the press were heavily coated with dirt and grease or some other foreign substance to such an extent that an adequate inspection was difficult. It was mutually agreed that the machinery would be shipped to Plywood's plant at Lacey, where a more thorough inspection could be made. The shipping charges from Seattle to Lacey were paid by Plywood.

Upon further inspection at Lacey, it was discovered that the steam plates were badly dented or pitted. Plywood officials also became convinced that other parts of the press were defective. It appeared that the piston or hydraulic ram was scored and gouged. Seemingly, it was thought that turning down the ram on a lathe would cause the clearance between it and the pressure cylinder or chamber to be so great that it would be difficult, if not impossible, to achieve sufficient compression to operate the press. The plates and ram were removed from the press, and Wienker arranged to have them reconditioned in Seattle at his own expense. They were shipped back to Seattle by Plywood.

The press previously had been operated by a central pumping or pressure system. An individual pumping system had to be provided for its operation at Lacey. Wienker testified that he had ordered such a system and that it could have been obtained within a reasonable time; however, no pumping system was delivered to Plywood.

After the plates and ram were resurfaced in Seattle, they were returned to Plywood's plant at Lacey. On the same day the plates and ram arrived at the Lacey plant, Plywood wrote a letter to Wienker, rescinding the sale. This letter read:

"After conferring with our legal counsel, we, as an officer of, and in behalf of, Lacey Plywood Company Inc., hereby declare that your firm has not delivered the small hot press ordered by us on June 9, 1950, in conformance with the con-

ditions of such purchase order *and the conditions of your confirmation of June 12, 1950,* and that you are in default because of nonperformance.

"Because of the foregoing conditions, we hereby notify you that we are now requesting a refund of the deposit of $4,000 made by us with the order, and we are herewith cancelling and revoking our order for the press, because of nonperformance on your part. We shall hold the parts of the press which have been delivered to our plant, shall not take delivery of additional parts for the press from this date, and will await your reply to this demand. You will note on our order that we required it, complete and in good working order within 30 days from June 9, 1950. [Signed Lacey Plywood Company Inc., J. E. Robertson Sec.-Treas.,]" (Italics ours.)

We gather from the above-quoted letter that Plywood was attempting to rescind because of alleged noncompliance by Wienker with (a) the condition contained in the purchase order requiring delivery within thirty days, and (b) the condition contained in the letter of June 12, 1950, which read "press in good working order."

After writing the above-quoted letter, Plywood's attorneys made a further demand for the return of the down payment of four thousand dollars. When Wienker refused to refund, a lawsuit was instituted to recover the four thousand dollars.

In its amended complaint, Plywood set up two alternative causes of action: (a) that Wienker had failed to deliver the press within thirty days, as allegedly agreed upon; (b) that the press "which was ordered, was not, in fact, delivered, since the press delivered did not meet the specifications on which the order was made," and "it was represented by the seller that the press was in good working order and the press would develop a pressure of 200 pounds per square inch . . . that in fact the press was not in good working order, the same was neither complete nor would it have been in good working order had the same been complete, since the parts delivered were in serious need of a complete overhauling and considerable machining before the press could have been used for any purpose."

At the trial, there was considerable dispute as to whether the agreement between the parties was to be based upon a purchase order from Plywood, dated June 9, 1950, as well as upon Wienker's so-called letter of confirmation, dated June 12, 1950. Plywood's purchase order contained a provision indicating delivery in thirty days. Wienker's letter contained no such specific provision relative to delivery, but did contain a provision which read: "Press in good working order," and among other things, a provision reading: "Delivery: subject to prior sale, fire, strikes, or contingencies beyond seller's control." Mr. Wendell J. Sala testified that he was president and general manager of Plywood on or about June 9, 1950, and that he delivered the purchase order and a check for four thousand dollars to H. C. Wienker at his office in Seattle on June 12, 1950. Mr. Sala testified:

"The purchase order, the original purchase order made out by Lacey Plywood, was given to him, and he in turn prepared this letter. Which I have just looked at. And I was told at the time that the letter was a confirmation of the purchase order. Consequently, I signed the letter. He agreed at that time that if he couldn't make delivery on the press, that we would just simply cancel the order. That was the discussion I had with him. Because if we couldn't receive it, it would be valueless."

The trial court rejected Plywood's theory that the contract was based on both the purchase order and the letter referred to heretofore. The position was taken that the contractual relationships of the parties would have to be determined solely on the basis of the letter. From a practical standpoint, this eliminated Plywood's theory regarding the requirement for delivery in thirty days. As a result, considerable testimony offered by Plywood, relating to the requirement for delivery within thirty days, was kept out of the case.

After rejecting the theory that Wienker had agreed to deliver in thirty days, the court held that Plywood was justified in rescinding the sale for breach of a warranty that the press was in good working order. On this particular

alternative cause of action, judgment was entered in favor of Plywood for the sum of four thousand dollars, with interest at six per cent from the date Plywood rescinded the agreement, together with costs and disbursements in the trial court. Wienker has appealed. Five assignments of error attack the findings of the trial court. Others are directed at the conclusions and the judgment. Plywood did not cross-appeal.

We think there was considerable merit in Plywood's contention that time was of the essence, and that the requirement of delivery within thirty days was significant—in other words, that the agreement between the parties should have been construed in the light of both documents rather than merely in light of the letter written by Wienker, dated June 12th. However, it is unnecessary to decide the question. The conclusion of the trial court regarding a breach of the warranty that the press was in good working order is consistent with the findings of fact. The findings, justifying the aforementioned conclusion, are supported by the evidence, and we will not overturn them.

As pointed out above, Plywood's complaint alleged that the press actually delivered was not the one that had been ordered. Mr. Axel Erikson, a Plywood official, testified as follows:

"Well, Mr. Wienker came down, and I showed him the condition of the press, and Mr. Wienker, he looked at it and he said, *'Well, that isn't the press I ordered; they must have sent another press.'*" (Italics ours.)

This testimony was not controverted, and in this connection the following testimony of H. C. Wienker himself appears to be significant:

"Q Some statement was made in here, I forget by which witness, that you made the comment that this wasn't the press that was ordered. I believe that was Mr. Erikson. A That was at the time the press was inspected when it arrived out at Consolidated, and I doubted that it was,—there were a number of presses, and I selected one in the car, and I doubted that it was the press that I had asked them to ship."

The testimony of Charles B. Elmore, who had been a machinist or millwright for Plywood, was as follows:

"Q Now, directing your attention to the press then and those parts generally, what can you tell us with respect to the general workability of that equipment? That is, would it work if it were all there and put together? A Would you restate that, please? Q I say, what can you tell us with respect to the general condition of that press and the parts that were there? That is, would it operate if all of the parts were there satisfactorily? A Well, it might possibly operate but it wouldn't operate satisfactorily. Q What generally was wrong with it? A Well, the plates were in such a condition that they couldn't make a finished product with it. The ram was in such a shape that you couldn't hold hydraulic fluid in it, it would leak badly. If the pumping equipment had been there,—which it wasn't,— MR. TAYLOR: The what? I didn't get that. A. pumping equipment. Pump motors and piping, and that just about covers the condition of the thing as a working unit. By MR. FRISTOE: Q Did it show evidence of having been operated in the recent past? A Looking at the machinery as it arrived in our plant, I would say it hadn't operated for a long time. Q. Matter of months, years? A Months—maybe years."

Regarding the condition of the press, Mr. Skoog, a witness for Plywood, testified:

"A Well, when it arrived, it was in very poor condition. The plates were badly marked up and the ram was scored, and it would be doubtful in my mind as to its ability to hold pressure, around the ceiling range, with the scores that were on the ram. Q And what, generally, was the condition of the rest of the press as to deterioration? Was it shiny and new? A No, it was in a very rusty condition, and there was large quantities of dirt, and foreign material on the press. It was difficult to ascertain if there were metal under some of the dirt, it was so thick in spots. Q I see. You and your father were the engineering consultants for Lacey Plywood at that time, were you not? A Yes, we were."

Plywood's exhibit No. 5 is a photograph, showing a press in good working order, exhibited by Wienker to officials of Plywood prior to the consummation of the sales agreement. Plywood's exhibit No. 9 is a photograph of the press actually delivered. For obvious reasons, there might be some

danger in relying solely upon photographic evidence. However, considering the corroborating testimony of Plywood's witnesses, a comparison of the two photographs indicates quite convincingly that there may very well have been a significant difference between the press which was actually ordered and the one delivered. In other words, Plywood's evidence might well have supported a finding that the machinery delivered was materially different from the goods bargained for in the contract, and justified a conclusion by the trial court that the seller had failed *altogether* to comply with his part of the contract.

As pointed out above, an unsuccessful effort was made to inspect the press, under rather adverse circumstances, apparently at a freight warehouse in Seattle. Thereafter, it was shipped to Plywood's plant at Lacey, Washington. Plywood paid the freight charges. At Plywood's plant, the press was inspected under more auspicious circumstances. Upon the discovery of the defective condition of certain parts, as to which all parties seem to have agreed, Wienker apparently suggested that the defective parts be shipped to Seattle for reconditioning. Plywood shipped the parts to Seattle for reconditioning. On the day the parts were re-delivered to Plywood at Lacey, Washington, the letter of rescission (quoted above) was written by Plywood.

It seems undisputed that important parts of the press were defective; that it was not "in good working order." Furthermore, there is substantial testimony that the defects were such that it may very well have been impossible to put the press "in good working order."

We think the parties contracted for the sale and delivery of a press "in good working order"; that Wienker failed to comply with this condition; that Plywood's conduct cannot be said to amount to a waiver of the condition, in other words, that the conduct of the parties, regarding the possibility of repairing the defective parts, was not such that it can be said they thereby modified their initial contract as to a sale and purchase of a press "in good working

order"; and finally, that the company was entitled to re-scind.

The judgment of the trial court is hereby affirmed.

GRADY, C. J., MALLERY, SCHWELLENBACH, HAMLEY, and WEAVER, JJ., concur.

OLSON, J. (dissenting)—As the majority state (and so does plaintiff in its brief), the parties agreed that the machine would be shipped to plaintiff's plant for inspection. After inspection, plaintiff did not reject the machine, but agreed that certain parts of it be reconditioned by defendants at their expense. After this work was done by defendants at considerable cost, and while the parts were in transit on their return to plaintiff, it notified defendants by letter that it had rescinded the contract. The ground of rescission given in this letter, quoted by the majority, was the late delivery of the machine, and not its defective condition. The ground relied upon in the letter properly was held to be insufficient by the trial court. It rested its decision upon the deficient condition of the machine delivered.

But there was no delivery of the machine by defendants. The delivery made was conditional, being only for the inspection of the machine by plaintiff, by the agreement of the parties. Neither of them intended that title to the machine should pass to plaintiff upon that delivery. Defendants had not breached their contract, but were putting the machine in deliverable condition, with plaintiff's consent, when plaintiff gave notice of rescission. There being no grounds for the rescission at the time it was done, it was premature.

The judgment should be reversed.

HILL and DONWORTH, JJ., concur with OLSON, J.